Elizabeth H. Murphy (SBN 174095)
Elizabeth.Murphy@Jacksonlewis.com
Philip Johnson (SBN 289254)
Philip.Johnson@Jacksonlewis.com
**JACKSON LEWIS P.C.**
725 South Figueroa Street, Suite 2500
Los Angeles, California  90017-5408
Telephone:   (213) 689-0404
Facsimile:    (213) 689-0430

Attorneys for Defendants
FALLON GROUP, INC. and MICHAEL BUCHNER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANDANA MELLANO, <br><br> Plaintiff, <br><br> vs. <br><br> FALLON GROUP, INC., a Minnesota corporation, MICHAEL BUCHNER, an individual, and DOES 1 through 10, <br><br> Defendants. | CASE NO.:  CV 17-5526-JFW (Ex) [Assigned for all purposes to the Hon. John F. Walter, Courtroom 7A] <br><br> **DEFENDANTS FALLON GROUP, INC.'S AND MICHAEL BUCHNER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> **DATE: April 23, 2018** <br> **TIME: 1:30P.M.** <br> **COURTROOM: 7A** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ................................... 1

       A.     Facts ................................................................................................. 1

       B.     Procedural background .................................................................... 6

III.   SUMMARY JUDGMENT STANDARD ................................................... 8

IV.    THE COURT SHOULD GRANT DEFENDANTS SUMMARY
       JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS. ............................... 8

       A.     Defendants are entitled to summary judgment on Plaintiff's contract
              claims. ............................................................................................... 8

              1.     Plaintiff's contract claims fail because her employment was at-
                     will. ......................................................................................... 9

                     a.     The Offer Letter's at-will language prevails, even
                            without an integration clause. ...................................... 9

                     b.     Integration is a question of law. .................................. 10

              2.     Plaintiff's bonus was not guaranteed. .................................... 11

              3.     Plaintiff did not perform .......................................................... 11

              4.     Plaintiff's claim that Fallon promised her "necessary resources"
                     is too vague to be enforceable. ............................................... 13

              5.     Because Plaintiff's breach of contract claim fails, her claim for
                     breach of the implied covenant of good faith and fair dealing
                     also fails. ................................................................................. 14

       B.     Defendants are entitled to summary judgment on Plaintiff's
              misrepresentation claims. .............................................................. 14

              1.     Plaintiff could not have reasonably relied on an alleged two-
                     year promise. ........................................................................... 15

              2.     Defendants did not know of the Publicis freeze until after
                     Plaintiff began at Fallon. ......................................................... 16

              3.     Plaintiff's reliance was not reasonable. ................................. 16

              4.     Fallon's alleged promise to provide Plaintiff "necessary
                     resources" is too vague as a matter of law. ........................... 17

       C.     Defendants are entitled to summary judgment on Plaintiff's gender
              discrimination claim. ...................................................................... 18

D.    Plaintiff cannot succeed on her wrongful termination claim. ....................... 19

E.    Defendants are entitled to summary judgment on Plaintiff's retaliation claim. ............................................................................................... 20

F.    Buchner cannot be liable for Plaintiff's gender discrimination or retaliation claim as a matter of law. ............................................................... 22

G.    Defendants are entitled to summary judgment on Plaintiff's claims for unpaid wages and corresponding penalties for failure to pay wages............ 22

V.    CONCLUSION ....................................................................................... 23

I.      **INTRODUCTION**

Defendant Fallon Group, Inc. ("Fallon") is an advertising agency headquartered in Minneapolis, Minnesota. Plaintiff, Mandana Mellano ("Plaintiff"), worked on an at-will basis as Fallon's Chief Media Officer from April 11, 2016 to April 3, 2017. Plaintiff joined Fallon after almost a year of extensive negotiations with Fallon, during which its CEO, individual defendant Michael Buchner, made very clear that one of Plaintiff's core responsibilities was to expand Fallon's media revenue.

But during her eleven-month tenure, not only did Plaintiff fail to generate even one single dollar of new business—a fact that Plaintiff concedes—Fallon's media department also lost 57.6% of its revenue. Because of this significant loss in revenue, Fallon decided to lay off Plaintiff and six other Fallon employees, including several men.

Plaintiff now claims that Fallon and/or Buchner: (1) breached an employment contract with her; (2) intentionally and/or negligently misrepresented the terms of Plaintiff's employment; (3) discriminated against Plaintiff due to her gender; (4) retaliated against Plaintiff; (5) wrongfully terminated Plaintiff; and (6) failed to pay Plaintiff a "not guaranteed" bonus and unspecified vacation wages.

For the reasons outlined below, however, none of these claims has merit and Defendants are entitled to summary judgment as a matter of law.

II.     **FACTUAL AND PROCEDURAL BACKGROUND**

    A. **Facts**

In November 2014, Fallon engaged Grace Blue Worldwide, a headhunter, to help Fallon find a Chief Communications Officer to lead Fallon's Media Department in Minneapolis. Defendants' Statement of Uncontroverted Facts and Conclusions of Law ("UF"), No. 4. Fallon preferred a female for this role. UF No. 5.

On April 7, 2015, Grace Blue proposed Plaintiff, who was then employed with Ogilvy & Mather ("Ogilvy") in an at-will position, earning a base salary of $199,500.00 (though, according to Grace Blue, Plaintiff was earning a base salary of $300,000, plus a

bonus of $25,000, and Plaintiff testified she was making in the "low 200s" with a bonus of $5,000 to $10,000). UF Nos. 7-9.

Between April and June, 2015, Fallon and Grace Blue corresponded extensively about the position. UF No. 10. When Plaintiff came to Minneapolis on June 16, 2015, for an interview, she delivered a PowerPoint presentation, proposing as her "vision for Fallon Media" that the position should be based in Los Angeles, where Plaintiff lived and where she thought Fallon should establish a "west coast presence." UF Nos. 11-12. In her PowerPoint, Plaintiff emphasized her connections to major tech companies in "Silicon Beach," and her plan to "get [Fallon] invited for major west coast and SoCal pitches." UF 12-13.

Buchner was thrown off by Plaintiff's unexpected Los Angeles proposal. UF No. 14. As Buchner put it, Plaintiff had "completely changed the rules of the game by turning the Minneapolis-based position into a remote location job." UF No. 15.

Despite its reservations, Fallon decided to proceed with Plaintiff's proposal "to create an anchor in LA."  UF Nos. 16. In September, 2015, Buchner advised Plaintiff that there was an "agreement in principle" to hire her, but that he needed further approval because Fallon did not have a Los Angeles office, any Los Angeles-based employees, or any revenue to justify opening an office there. UF Nos. 17. Buchner explained that it was important "to get the media business out there [Los Angeles] going strong, and then have the justification to open a Fallon LA office," which was "pretty similar to what [Plaintiff] proposed in [her] plan." UF No. 18. Plaintiff responded: "I'm totally following the logic here." UF No. 19.

In February 2016, Plaintiff submitted a written "90-Day Roadmap," which outlined her vision for what the proposed Los Angeles-based position would entail, and what Plaintiff would do to make it a success. UF No. 20. Among other things, Plaintiff represented that by the end of her 90th day of employment, she would "begin to onboard new biz heading into CYQ3 and start a more confident media revenue stream." UF No. 21. Plaintiff admitted several times during her deposition that bringing in new clients and

revenue was indeed one of her most important tasks. UF No. 22. Plaintiff characterized new revenue as a "7 out of 10" in terms of importance. UF No. 23.

Grace Blue was eventually excused from the negotiations, so Plaintiff and Buchner corresponded and negotiated directly, even though Fallon paid Grace Blue a fee of $100,500 for its services over the course Plaintiff's lengthy hiring process.[1] UF No. 24. During those discussions, Buchner repeatedly emphasized that Plaintiff would be charged with bringing in new clients and revenue because Fallon could not justify opening or maintaining a Fallon office otherwise. UF No. 25. After almost a year of back-and-forth negotiations, multiple phone calls, dozens of emails, Fallon paying $100,500 in fees to Grace Blue, and multiple in-person meetings and interviews, Fallon offered Plaintiff the at-will position of Chief Media Officer, based in Los Angeles.

On March 4, 2016, Buchner sent Plaintiff a proposed offer letter outlining the terms of their at-will agreement. UF No. 26. On March 8, 2016, Plaintiff and Buchner discussed the offer letter by phone, during which Plaintiff asked Buchner to make several changes to the proposed offer letter. UF No. 27. Shortly after Buchner's call with Plaintiff, he emailed his colleagues, Julie McBride and Dawn Lamm, to outline the list of seven items that he had discussed with Plaintiff regarding her offer letter, to ensure that Ms. McBride and Ms. Lamm were on the same page. UF No. 28.

On March 9, 2016, Buchner submitted a revised offer letter to Plaintiff to reflect several changes that she requested, including revising her title from Chief Communications Officer to their agreed-upon title for her position, Chief Media Officer, as well as Plaintiff's being able to leave early on certain days for child care (the "Offer Letter"). UF No. 29. Buchner also "built in some language about getting clarity on [the] new bonus structure once it's in place." UF No. 30. According to Plaintiff, her Offer Letter contained the most important aspects of her employment with Fallon. UF No. 31.

---

[1] Fallon paid Grace Blue in 3 installments: $35,000 in February, 2015, $35,000 in February, 2016, and $30,000 in March, 2016. UF 6.

At no time during these extensive communications did Plaintiff put in writing anything about an alleged two-year commitment, a guaranteed bonus, or any of the other alleged promises that form the bases of Plaintiff's claims. UF No. 33. As reflected in the Offer Letter, Plaintiff's position was at-will, her annual salary was $335,000 (making her the third-highest paid Fallon employee), and she was eligible for a "not guaranteed" annual bonus "based on the agency's overall performance and [Plaintiff's] individual contribution," as well as four weeks' paid vacation. UF Nos. 32, 37. Plaintiff admitted during her deposition that she received a copy of Fallon's written vacation policy, in which Fallon clearly delineates that all vacation is "accrued" for all "permanent, full-time employees."  UF Nos. 34-35.

Plaintiff signed the revised offer letter (the "Offer Letter") on April 11, 2016, her first day at Fallon as its Chief Media Officer. UF No. 36. As Chief Media Officer, managed approximately 25 employees in Fallon's media department. UF No. 36.

Three days later, Publicis, Fallon's parent company, announced a global hiring freeze on all of its subsidiaries, including Fallon. UF No. 39. The freeze took effect on April 12, 2016, and would last "until [Publicis'] cost reduction plan is giving the expected results." UF No. 39. The freeze generally imposed restrictions on hiring freelancers, granting raises, and hiring new employees, though exceptions could be made for "critical" positions and employees. UF No. 40. The freeze remained in place throughout Plaintiff's eleven-month employment. UF No. 41.

In May 2016, Buchner was presented with the opportunity for Fallon to open up a San Francisco office by "re-flagging" (*i.e.*, rebranding) an existing office run by Riney, another Publicis Groupe subsidiary. UF No. 42. Buchner rejected the opportunity in favor of Plaintiff's LA concept, explaining that although Fallon wanted a "West Coast presence . . . our strong preference would be to have an LA office versus a San Francisco office." UF No. 43. Buchner further explained: "[W]e have a new Chief Media Officer, Mandana Mellano, who will be living permanently in LA and would prefer to have her and a small team housed out of a [Publicis Communications, North America] office until we can

generate the revenue and build the business case for our own office in that market." UF No. 44.

In September 2016, Buchner asked Plaintiff to lead a pitch to save Fallon's largest media client, MTV. UF No. 45. At Plaintiff's request and in spite of the hiring freeze, Fallon hired a freelancer to assist Plaintiff with the pitch. UF No. 46. But the pitch was unsuccessful, and MTV ended its relationship with Fallon in October, 2016. UF Nos. 47. In February, 2017, the Independent Film Channel, another Fallon media client, decided to consolidate its business with another agency. UF No. 48. The loss of MTV and Independent Film Channel resulted in a 57.6% net loss in Fallon's media revenue. UF No. 49.

On February 7, 2017, Buchner visited Plaintiff in Los Angeles to discuss the sharp revenue downturn for Fallon media, and advised Plaintiff that it was critical for her to bring in business that would generate revenue. UF No. 50. In response, Plaintiff circulated to Buchner and other Fallon employees a long list of items and potential clients that were in her "pipeline," not one of which subsequently materialized. UF No. 51.

On February 8, 2017, Fallon announced the opening of its New York office, which had been presented to Fallon in 2016 as an opportunity to "re-flag" AR Media, a subsidiary of Publicis Groupe that had about 30 employees (many of whom were female) and existing clients and revenue. UF No. 52. Fallon's New York office was in a different business than "Fallon LA" in that Fallon New York had no media personnel and no media business; its work was exclusively for Fallon's "creative" endeavors. UF No. 53.

On March 3, 2017, Buchner notified Plaintiff that because of unfulfilled goals and the significant loss in media revenue, Fallon had decided to end her employment. UF Nos. 54. In total, Fallon laid off seven media employees: three men and four women, including Plaintiff. UF No. 55.

During their March 3, 2017 conversation, Plaintiff told Buchner that she believed Fallon showed "favoritism" to its New York office and its head, John King. UF No. 56. But Buchner explained that Fallon New York came with an existing office, existing

employees, and existing revenue, and was essentially a renaming of an already-existing office, whereas Fallon's presence in Los Angeles was, according to Plaintiff, a "one-woman show" with no revenue and no clients. UF No. 57. Further, King had an established track record of bringing in new clients and revenue, as demonstrated by his obtaining two clients worth several million dollars within months of the New York office opening, and his success with seven out of 10 previous client pitches. UF No. 58. Plaintiff stated that she understood Buchner's decision was "just business." UF No. 59.

As part of her layoff, Fallon offered Plaintiff three weeks' severance, and continued salary and Fallon email access through April 3, 2017. UF No. 60. On further reconsideration, however, Fallon shut off Plaintiff's email access on March 16, 2017. UF No. 61. Plaintiff's last day at Fallon was April 3, 2017. UF No. 62. Pursuant to Fallon's vacation policy, Fallon paid Plaintiff for the 6.64 days of paid vacation she had accrued in 2017 through April. UF No. 63.

Shortly after her layoff, Plaintiff, through counsel, informed Fallon that she believed she was entitled to additional vacation pay.  Fallon also voluntarily paid Plaintiff for 10 additional days of vacation pay (approximately $13,250) and waiting time penalties for 16 days of alleged non-payment of that pay (approximately $15,000). UF No. 64. This calculation of 16 total days of vacation pay was based off of Plaintiff's accruing 20 days of vacation during her time with Fallon and using at least four in 2016, though she admitted to having taken "a few" in 2017. UF No. 64-65.

### B. Procedural background

In her operative First Amended Complaint, Plaintiff alleges claims against Defendants for: (1) breach of contract; (2) breach of the implied covenant and fair dealing; (3) fraud and deceit; (4) negligent misrepresentation; (5) wrongful termination in violation of public policy; (6) failure to pay wages in violation of California Labor Code § 201; (7) waiting time penalties under California Labor Code § 203 for failure to pay wages; (8) gender discrimination in violation of California's Fair Employment and

Housing Act ("FEHA"), Cal. Gov. Code §§ 12900 et seq.; and (9) retaliation in violation of FEHA. ECF No. 41, First Amended Complaint ("FAC"), at 1.

Plaintiff's first two claims are based on her assertions that Fallon, primarily through Buchner, promised her that "it would permit her to hire the team necessary and provide other necessary resources to make the [Fallon Los Angeles] office a success," and guaranteed that she would have "at least two years to build the Los Angeles office into a success." FAC, ¶ 25. Plaintiff alleges that Defendants breached both agreements by: (i) luring her away from Ogilvy where she was earning $135,000 *less* than she did at Fallon; (ii) failing to provide her "necessary resources"; (iii) not permitting her to "hire the necessary team"; and (iv) terminating her after eleven months. According to Plaintiff, she did not bring in new clients or revenue because she did not have the "necessary resources" or staff to do so.  When asked why Fallon's existing staff of some 25 people was not sufficient, Plaintiff dismissed most of those employees as "incompetent."

Plaintiff's third and fourth claims are premised on largely the same assertions. She contends that Defendants (namely, Buchner) falsely misrepresented to her that she would have "necessary resources" and two years to establish Fallon's Los Angeles office, and that they made these representations "to quit her job at the Ogilvy firm and accept Los Angeles-based employment with Fallon." FAC, ¶¶ 38; *id.* ¶ 45. Plaintiff asserts that Defendants knew these representations were false and misleading because they allegedly knew that Plaintiff would not be "permitted to hire anyone," *id.* ¶11, Fallon would not "provide other necessary resources to make the [Fallon Los Angeles] office a success," *id.* ¶ 25, and Plaintiff would not have two years to make the office successful. *Id.* In other words, the gravamen of Plaintiff's claims is that Defendants effectively set her up to fail because they knew Fallon would not be able to provide her with what she needed to perform.  But as discussed below, the notion that Defendants would spend a year negotiating with Plaintiff, pay more than $100,000 in headhunter fees, and pay Plaintiff the third-highest salary in the company, knowing all the while that their real intention was to set her up just to fire her, makes absolutely no logical sense whatsoever.

1
2
3
4
5
6
7

Plaintiff's gender discrimination and wrongful termination claim turn on her belief that Fallon terminated her due to her gender. *See* FAC, ¶¶ 51, 69. As to her retaliation claim, Plaintiff alleges that, in response to her attorney's letter to Fallon accusing it of gender discrimination, Defendants cut off her Fallon email access and refused to pay out her unused vacation time or annual bonus. FAC, ¶ 74. She claims that Fallon cutting off her Fallon email access prevented Plaintiff from effectively transitioning from Fallon, and caused her financial and emotional damages.

8
9
10

Plaintiff bases her remaining claims for unpaid wages and associated waiting penalties on her contention that Fallon failed to pay out the correct amount of unused vacation time, and that it owes her for her "unguaranteed" bonus. FAC, ¶¶ 56, 63.

11

## III.   SUMMARY JUDGMENT STANDARD

12
13
14
15
16
17
18

Summary judgment under Rule 56 "is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks omitted).

19
20

## IV.   THE COURT SHOULD GRANT DEFENDANTS SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS.

21
22

### A.   Defendants are entitled to summary judgment on Plaintiff's contract claims.

23
24
25
26
27

To succeed on her breach of contract claim, Plaintiff must establish: (i) the existence of a contract, (ii) the plaintiff's performance or excuse for non-performance, (iii) the defendant's breach, and (iv) damages to the plaintiff as a result. *Acoustics, Inc. v. Trepte Construction Co.*, 14 Cal. App. 3d 887, 913 (1971). If Plaintiff fails to prove one element of the claim, the entire claim fails. *See id.*

28

### 1. __Plaintiff's contract claims fail because her employment was at-will.__

Plaintiff asserts that Defendants breached an alleged employment contract with her by (i) luring Plaintiff away from a significantly lower paying job at Ogilvy; (ii) terminating her employment in less than two years; (iii) not permitting Plaintiff to hire people to assist her; and (iv) not providing her "other necessary resources." FAC ¶ 27. But Plaintiff's Offer Letter explicitly states that her position was at-will and that "the time period for [her] employment [was] indefinite." "An at-will employment may be ended by either party at any time without cause, for any or no reason, and subject to no procedure except the statutory requirement of notice." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 335 (2000). Fallon therefore was entitled to terminate Plaintiff's employment at any time and for any reason, which precludes her breach of contract claim as a matter of law. *See id.* at 335-37; *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391-92 (2006) (holding at-will language in plaintiff's employment contract barred any breach of contract claim for termination without good cause). The Court should grant summary judgment on Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing on this basis alone. *See Horn v. Cushman & Wakefield W., Inc.*, 72 Cal. App. 4th 798 (1999) (holding at-will employee has no cognizable claim for breach of an employment contract or for breach of the implied covenant of good faith and fair dealing).

### a. __The Offer Letter's at-will language prevails, even without an integration clause.__

Plaintiff will argue that the at-will language does not bar her contract claims because her Offer Letter does not contain an integration clause. But express at-will language prevails over a claimed implied agreement, *even in the absence of an integration clause. Starzynski v. Capital Pub. Radio, Inc.*, 88 Cal. App. 4th 33, 37-38 (2001). There cannot be a valid express contract and an implied contract, each embracing the same subject but requiring different results. *Id.* at 38; *Halvorsen v. Aramark Uniform*

---

*Services, Inc.*, 65 Cal. App. 4th 1383, 1388 (1985). When this occurs, "[t]he express term is controlling even if it is not contained in an integrated employment contract." *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 272 (1987). This is so because "it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement." *Id.* at 271.

Accordingly, the express at-will language of Plaintiff's Offer Letter precludes any argument that there was any implied contract, any two-year promise or other alleged verbal promises, and/or claim that Defendants breached such alleged contract with her by terminating her after eleven months. *See Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 630 (holding employees' "express at-will agreement precluded the existence of an implied contract requiring good cause for termination").

### b.   <u>Integration is a question of law.</u>

Even if the Court determines that integration is necessary in order to summarily adjudicate Plaintiff's contract claims in Defendants' favor, such a determination is a question of law that is entirely appropriate for the Court to decide. "An express integration clause is not necessary to a determination that an agreement is integrated." *Meyoter v. Chassman*, 504 F.3d 919, 935 (9th Cir. 2007). "The central question in determining whether there has been an integration . . . is whether the parties intended their writing to serve as the exclusive embodiment of their agreement." *Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379, 1385-86 (1989). When resolving this issue of law, "the court must attempt to place itself in the same situation in which the parties found themselves at the time of contracting" by looking at "the circumstances surrounding the formation of the contract, and prior negotiations." *Haggard v. Kimberly Quality Care, Inc.*, 39 Cal. App. 4th 508, 518 (1995).

Here, this Court may easily conclude that the Offer Letter was intended as an integrated document, because Plaintiff extensively negotiated the terms of her agreement with Fallon over the course of nearly a year, at first through Grace Blue, and then directly with Buchner. When Buchner provided Plaintiff her original offer letter, she asked him to

insert various revisions so that, for example, the letter would reflect the title she wanted, Chief Media Officer. A few days later, Buchner sent Plaintiff a revised Offer Letter, which included her requested job title. The granularity of their agreement and Plaintiff's involvement in the negotiation is reflected by the fact that Plaintiff wanted—and Buchner agreed—that Plaintiff could leave work at 4:45 P.M. as needed for childcare and that Fallon would provide her a personal trainer when she was required to work out of Minneapolis. Plaintiff's deep involvement in the negotiation process shows that the final Offer Letter reflects the full understanding of their agreement. It is difficult to conceive why Plaintiff would insist that the Offer Letter specifically reference an occasional 4:45 P.M. leave time and a personal trainer in Minneapolis while acceding to the Offer Letter's stating her employment was at-will if it was her understanding that she was guaranteed two years at Fallon.

Plaintiff's employment was expressly and quite clearly at-will, precluding her as a matter of law from asserting any contract claims in this matter. *See id.*

### 2.   <u>Plaintiff's bonus was not guaranteed.</u>

Similarly, Plaintiff's Offer Letter explicitly states that her bonus was "not guaranteed," which Plaintiff admitted in her deposition. Like Plaintiff's impermissible implied contract claims, Plaintiff's assertion that she was guaranteed a bonus cannot contradict the explicit language of her Offer Letter, which states her bonus was "not guaranteed"; the Offer Letter's language is controlling, even if it is not a fully integrated contract (which it is). *See id.*; *see also Shapiro*, 152 Cal. App. 3d at 482. Plaintiff's unfounded belief that she was guaranteed a bonus cannot be squared with the plain, unambiguous language of her Offer Letter. Defendants are therefore entitled to summary judgment on Plaintiff's contract claims to the extent they are premised on her purported entitlement to a bonus, which was not guaranteed.

### 3.   <u>Plaintiff did not perform.</u>

Even if the Court were to find that Plaintiff's position was not at-will and that the parties had formed an implied contract with additional terms not reflected in Plaintiff's

Offer Letter (such as the alleged two-year guarantee), Plaintiff admittedly failed to perform her end of the bargain, which precludes any contract claim she may have. *See Acoustics, Inc.*, 14 Cal. App. 3d at 913; *see also Consolidated World Investments, Inc., v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373, 380 (1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance.").

Plaintiff testified that Buchner made clear when they were negotiating her position at Fallon that one of her most important—if not *the* most important—tasks was to grow Fallon's media department by bringing in new clients and revenue. As Plaintiff conceded, this was "7 out of 10" in terms of importance. Plaintiff's 90-day plan, which she prepared and proposed to Buchner, required that Plaintiff would increase media revenue within 90 days (*i.e.*, by July 2016). Plaintiff, however, did not bring in a single dollar of new business for Fallon media within her first 90 days, as promised in her 90-day plan. In fact, she did not bring in a single dollar of revenue during her eleven-month employment. Plaintiff's admitted failure to perform this integral part of her agreement with Fallon renders her unable to succeed on any contract claim. *See Consolidated World Investments*, 9 Cal. App. 4th at 380.

Plaintiff will attempt to point fingers at others—including her own subordinates—but the fact remains that Plaintiff understood from the outset that, as head of Fallon's media department, she was responsible for bringing in new clients and generating new revenue for Fallon media, yet she failed to bring in a single dollar of revenue during her eleven months at Fallon. Her failure to perform this fundamental aspect of her agreement with Fallon forecloses her ability to succeed on her contract claims. *See Acoustics, Inc.* 14 Cal. App. 3d at 913 (holding that the plaintiff's failure to perform precluded its breach of contract claim).

///

///

///

### 4. <u>Plaintiff's claim that Fallon promised her "necessary resources" is too vague to be enforceable.</u>

Throughout the FAC, Plaintiff alleges Fallon failed to provide her the "necessary resources" for her to get the job done. This alleged promise, even if made, is too vague to be enforceable. "[C]ourts will not enforce vague promises about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise." *Scott v. Pacific Gas & Electric Co.*, 11 Cal.4th 454 (1994), *disapproved on other grounds in Guz*, 24 Cal.4th at 352 n.1.

*Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th 201, 213-214 (1993), illustrates this principle well. In *Rochlis*, the Court of Appeal held that seven specific promises the defendant allegedly made to the plaintiff were "simply too vague and indefinite to be enforceable." Among other things, the defendant promised that: (1) plaintiff would participate in all meetings that the defendant's president had with the company's chief executive officer; (2) plaintiff would "actively and meaningfully participate in all [of defendant's] creative activities"; and (3) "plaintiff would be in charge of all administrative matters concerning [the defendant] and all officers and employees would report to him administratively." *Id.* at 213. The court held that these and other promises—all of which are far more specific and concrete that Fallon's alleged promise of "necessary resources"—were too vague to be enforceable as a matter of law. The court reasoned that to hold otherwise would "impose on the court the burden of making financial and management decisions better left to the parties." *Id.* at 214.

So, too, here if the Court were to find that Fallon breached its promise to provide Plaintiff "necessary resources." Making that determination would require scrutinizing Fallon's day-to-day operations, which this Court is unable to do as a factual and legal matter. *See id.* ("[L]itigation cannot become a vehicle for the micromanagement of day-to-day corporate affairs.").

In any event, Defendants did not breach this alleged promise. Despite alleging that she "was never permitted to hire anyone" in Los Angeles, Plaintiff conceded in

deposition that she was, in fact, able to hire freelancers to assist her. UF 42. But, according to Plaintiff, the freelancers she hired "didn't have what it would take to help." UF 66. Similarly, Plaintiff had a permanent staff of approximately 25 Fallon team members to draw from, but she considered many of them incompetent or otherwise unable to do the job she required of them. UF 67.

Either one of these problems—that the alleged promise of "sufficient resources" is too vague to be enforced, or that Fallon provided ample "resources"—is sufficient to justify this Court granting summary judgment on this aspect of Plaintiff's contract claims.

### 5.   Because Plaintiff's breach of contract claim fails, her claim for breach of the implied covenant of good faith and fair dealing also fails.

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing rests on the same allegations as her breach of contract claim. *See* FAC, ¶33. Claims for breach of the implied covenant may be disregarded as superfluous when they do nothing more than repeat and re-allege the same allegations set forth in a companion claim for breach of contract. No additional liability is created thereby and no claim is actually stated in such cases. *Guz*, 24 Cal.4th at 352.

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails for the same reasons as does her breach of contract claim, particularly given that Plaintiff's employment was at-will. Accordingly, Defendants are entitled to summary judgment on both claims. *See Horn*, 72 Cal. App. 4th at 474 (holding at-will employee has no cognizable claim for breach of an employment contract or for breach of the implied covenant of good faith and fair dealing); *Digerati v. Holdings, LLC*, 194 Cal. App. 4th 873, 885 (2011) ("Although breach of the implied covenant often is pleaded as a separate count, a breach of the implied covenant is necessarily a breach of contract.").

### B.   Defendants are entitled to summary judgment on Plaintiff's misrepresentation claims.

To establish a claim for fraud, Plaintiff must show that: (1) the defendant made a misrepresentation of a past or existing material fact or concealed such facts when under a

duty to disclose; (2) the defendant made the representation with the intent to defraud the plaintiff; (3) the plaintiff justifiably relied on the misrepresentation; and (4) the plaintiff suffered legally cognizable damages as a result. Cal. Civ. Code § 1710; *Lazar v. Sup. Ct. (Rykoff-Sexton, Inc.)*, 12 Cal. 4th 631, 638 (1996). Further, plaintiff must show that Defendants knew the representation was false or had no reason to believe it to be true. Cal. Civ. Code § 1710. The elements of a negligent misrepresentation claim are similar; Plaintiff must also show that Defendants lacked a reasonable ground for believing the representation to be true. Cal. Civ. Code § 1710(2); CACI 1903.

Like her contract claims, Plaintiff alleges that Fallon, primarily through Buchner, made the following representations about her position with Fallon: (1) her employment was guaranteed for two years; (2) she would be able to hire employees to assist her; and (3) Fallon would provide her "other necessary resources to make the [Fallon LA] office a success." FAC ¶38. None of these purported misrepresentations—even if made—is sufficient to support Plaintiff's misrepresentation claims.

### 1.    Plaintiff could not have reasonably relied on an alleged two-year promise.

Plaintiff has no evidence that Fallon or Buchner ever promised that her position was guaranteed for two years. As her extensively negotiated Offer Letter made clear, her employment with Fallon was at-will. Even if Buchner had made a promise of two years (which he did not), Plaintiff could not have reasonably relied on the representation given her at-will status. *See Camp*, 35 Cal. App. 4th at 639-40 (affirming judgment for employer on plaintiff's misrepresentation claim because she "was an at-will employee who thus had no reasonable expectation that she would be employed . . . for any particular length of time"); *Shapiro*, 152 Cal. App. 3d at 483 (holding that an employee cannot reasonably rely on a promise that conflicts with employee's contract's at-will provision).

/ / /

/ / /

### 2.    Defendants did not know of the Publicis freeze until after Plaintiff began at Fallon.

The undisputed evidence shows that no one at Fallon knew that Publicis was going to impose the hiring freeze until after Plaintiff began at Fallon. Plaintiff has no evidence beyond her own unfounded speculation to suggest otherwise. UF 71. There was no reason for Fallon and Buchner to spend over a year negotiating Plaintiff's position—including changing the position from Minneapolis to Los Angeles, per Plaintiff's suggestion—while paying Grace Blue over $100,000 in an effort to "lure her away from [a significantly lower salary at] Ogilvy" and set her up to fail at Fallon. Defendants could only benefit from Plaintiff performing on her contract and therefore had every reason to do what they could to help Plaintiff succeed. Simply put, Plaintiff's fraud claims make no sense. It is difficult to see how Defendants "lured" Plaintiff away from Ogilvy when her position there was at-will and she was making substantially less ($199,500) than she made at Fallon ($335,000). This is particularly true given that one of the Grace Blue representatives who worked with Plaintiff, Natalie Gibson, testified that Plaintiff told her that she was making approximately $325,000 at Ogilvy, which Grace Blue relayed to Fallon on several occasions.

### 3.    Plaintiff's reliance was not reasonable.

According to Plaintiff, she knew within days of her employment that Publicis had imposed a freeze on Fallon that rendered it impossible for her (or Fallon) to hire any new employees. She further alleges Fallon never provided her with the "necessary resources" she required. Despite this, Plaintiff remained at Fallon for eleven months.

*Rochlis*, 19 Cal. App. 4th at 215, shows that, even assuming the truth of Plaintiff's position, she did not detrimentally rely on Defendants' alleged misrepresentations. In *Rochlis*, the plaintiff "discovered the truth" about his position, which he contended his employer had misrepresented, yet he stayed on the job nine months beyond the termination of his contract. *Id.* The Court of Appeal held that the plaintiff did not justifiably rely on his employer's alleged misrepresentations by virtue of staying on the

job for ninth months after his contract expired, and therefore his fraud claim failed. *Id.*; *see also Nollette v. LRICO Servs., LLC*, 2017 Cal. App. Unpub. LEXIS 6345, at *16 (Sept. 14, 2017) (relying on *Rochlis* and holding that the plaintiff did not justifiably rely on her employer's alleged misrepresentations when she stayed on the job for over a year after discovering them); *Priseler v. Calfarm Ins. Co.*, 2002 Cal. App. Unpub. LEXIS 2563, at *10-11 (2002) (citing *Rochlis* and affirming summary judgment on fraud claim where plaintiff knew of alleged misrepresentations yet remained on job for approximately one year).

Similarly, Plaintiff learned that she would not be able to hire employees she considered necessary (due to the Publicis freeze) within days of joining Fallon, yet she remained on the job for eleven months. According to Plaintiff, she made multiple requests to hire freelancers in Los Angeles, which were denied because the freelancers were too expensive given the freeze. One request was also denied because the proposed freelancer was from Ogilvy, and Plaintiff's agreement with Ogilvy prevented her from hiring anyone from Ogilvy. UF 68. Her reliance on Defendants' alleged misrepresentations about hiring and providing her "necessary resources" was not reasonable as a matter of law. Defendants are therefore entitled to summary judgment on this aspect of her misrepresentation claims.

### 4. Fallon's alleged promise to provide Plaintiff "necessary resources" is too vague as a matter of law.

Plaintiff's misrepresentation claims are premised, in part, on Defendants' alleged promise to provide her "other necessary resources" for her to perform her job. For the reasons outlined above, even assuming Defendants made such a promise, it is too vague and indefinite to be enforceable. *See generally Rochlis*, 19 Cal. App. 4th at 216 ("Promises too vague to be enforced will not support a fraud claim any more than they will one in contract."). Determining whether Fallon provided Plaintiff "necessary resources" will impermissibly require this Court to assess Fallon's day-to-day operations and permit this case to "become a vehicle for [Fallon's] micromanagement." *See id.* at

213-14. Accordingly, Defendants are entitled to summary judgment on this aspect of Plaintiff's misrepresentation claims.

### C. **Defendants are entitled to summary judgment on Plaintiff's gender discrimination claim.**

A prima facie case of gender discrimination requires a showing that Plaintiff was (1) a member of a protected class; (2) performing competently in the position she held; (3) suffered an adverse employment action; and (4) the action occurred under circumstances suggesting a discriminatory motive. *Guz*, 24 Cal. 4th at 355. Defendants have "the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors." *Serri v. Santa Clara Univ.*, 226 Cal. App. 4th 830, 861 (2014). This burden is not onerous and "is generally met by presenting admissible evidence showing the defendant's reason for its employment decision." *Wills v. Superior Court*, 195 Cal. App. 4th 143, 160 (2011) (citation omitted).

If the employer produces evidence showing a legitimate reason for the adverse employment action, the presumption falls away and the burden shifts back to the employee to provide "'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual." *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1109 (2007). Mere argument and speculation, without more, does not support an inference of discrimination. *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 846 (2001).

Here, the undisputed evidence shows that Plaintiff was laid off with six other people (several of whom were male), due to an approximately 57.6% reduction in Fallon's media revenue. As Buchner explained, Plaintiff was the third-highest-paid employee at Fallon, and was the highest-paid in the media department. Because of the significant loss of Fallon media revenue, Fallon was faced with either terminating several other employees or terminating Plaintiff. Plaintiff has no evidence—direct or otherwise— that undermines this conclusion, much less "substantial responsive evidence" that shows Fallon's decision was discriminatory. Plaintiff has nothing more than her subjective

beliefs, which are insufficient here. *See King v. United Parcel Service, Inc.* 152 Cal. App. 4th 426, 433 (2007) ("[P]laintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact"); s*ee also Sangster v. Paetkau* 68 Cal. App. 4th 151, 163 (1998) ("[R]esponsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact").

Defendants anticipate that Plaintiff will argue that Fallon's gender-based discrimination claim is evidenced by the fact that Fallon made the business decision to direct resources to opening Fallon's New York office in February 2017, which was run by a male, John King. But, as Buchner testified, that decision was based on the legitimate, non-discriminatory reason that the Fallon New York office was already existing with clients, employees, and revenue. Further, King had an established track record of bringing in new clients and revenue, as demonstrated by his obtaining two clients worth several million dollars within months of the New York office opening, and his success with seven out of 10 previous client pitches. And in any event, Fallon's New York office did not have any media business; all of its work was for Fallon's "creative" business.

Though her gender discrimination claim makes no mention of it, Plaintiff also may argue that Fallon is biased against women because it commissioned an artist, Mark Mulroney, who—entirely unrelated to Fallon—created artwork that Plaintiff cites in her FAC, and alleges offends her. But this is quite a stretch, as Plaintiff has no evidence whatsoever that Fallon's decision to commission Mr. Mulroney had anything to do with his non-Fallon-related artwork. UF 69. All of the artwork Mulroney did for Fallon was done anonymously and "G-rated." UF 70. Critically, Plaintiff conceded that none of the artwork Mulroney did for Fallon was offensive or sexual in nature. UF 70.

### D. **Plaintiff cannot succeed on her wrongful termination claim.**

Plaintiff's wrongful termination claim is premised on her assertion that Defendants terminated her due to her gender. FAC ¶ 51. As explained above, there is no evidence to

support this assertion. On the other hand, there is undisputed evidence showing that Plaintiff was terminated—along with several other Fallon employees, including three men—solely due to a 57.6% decrease in Fallon's media revenue. Accordingly, Plaintiff cannot succeed on her wrongful termination claim. *See Stevenson v. Superior Court*, 16 Cal. 4th 880, 895-96 (1997) (observing that wrongful termination claim turns on success of underlying discrimination claim).

### E. Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

To succeed on her retaliation claim, Plaintiff must prove that: (1) she engaged in a "protected activity;" (2) Defendants subjected her to an adverse employment action; and (3) a causal link existed between the protected activity and Defendants' conduct. *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042. "An adverse employment action . . . requires a substantial adverse change in the terms and conditions of the plaintiff's employment." *Holmes v. Petrovich Dev. Co., LLC*, 191 Cal. App. 4th 1047, 1063 (2011) (citations and quotation marks omitted). "Not every change in the conditions of employment, however, constitutes an adverse employment action." *Thomas v. Dept. of Corrections*, 77 Cal. App. 4th 507, 511 (2000) (citations and quotation marks omitted). Changes in terms and conditions of employment must be both substantial and detrimental to be actionable. *Horsford v. Bd. of Trustees of Calif. State Univ.*, 132 Cal. App. 4th 359, 373 (2005) (citations and quotation marks omitted). Plaintiff must also prove that retaliation was a substantial motivating reason for the adverse employment action. *Harris v. City of Santa Monica*, 56 Cal.4th 203, 232 (2013).

Here, Plaintiff alleges that Defendants retaliated against her by (i) failing to pay out her vacation pay and (ii) shutting off her Fallon email access two weeks after she had been told her she was being laid off in a month but two weeks before her last day constitutes an adverse employment action.

With regard to her email access allegation, Defendants are unaware of any authority that supports Plaintiff's position. *Nelson v. Jones Day*, 2013 Cal. App. Unpub.

1  LEXIS 4425 (2013), however, comes close.[2] In that case, the plaintiff's access to her
2  email had been "temporarily blocked" because she had been mistakenly placed on a list
3  of terminated employees. *Id.* at *8. Because of this, a legal recruiter was informed that
4  she had been terminated. *Id.* at *17. Plaintiff claimed that these incidents, coupled with a
5  meeting during which two of her superiors "took turn hurling demeaning insults" at her,
6  constituted an adverse employment action. *Id.* The Court of Appeal disagreed, finding
7  that none of her allegations amounted to "substantial adverse changes in the terms and
8  conditions of her employment." *Id.* at *18.

9      Here, Plaintiff only alleges that her email access was cut off approximately two
10 weeks after she was told she would be laid off and approximately two weeks before her
11 last day. Given that the plaintiff in *Nelson* was found not to have suffered an adverse
12 employment action, even though her email access was temporarily shut off, she was not
13 poised to be terminated, *and* two of her superiors insulted her, it follows that Plaintiff's
14 email access being cut off, without more, is insufficient to constitute an adverse
15 employment action as a matter of law. Because Plaintiff did not suffer an adverse
16 employment action, she cannot state a claim for retaliation. *See Horsford*, 132 Cal. App.
17 4th at 373. Defendants are therefore entitled to summary judgment on this aspect of
18 Plaintiff's retaliation claim.

19     With regard to her vacation pay claim, Plaintiff cannot establish a nexus between
20 the alleged protected activity—hiring an attorney and alleging Fallon discriminated
21 against her—and Defendants' purported failure to pay her the vacation pay she was
22 allegedly due. Nor can Plaintiff establish that retaliation was a "substantial motivating
23 reason" in Defendants' allegedly not paying her vacation pay.

24     Defendants paid Plaintiff for the vacation she had accrued in accordance with its
25 policy. Contrary to Plaintiff's position, Defendants understood that, under her contract,
26 Plaintiff could accrue four weeks of vacation pay throughout each year of employment;

27
28 [2] Federal courts may consider unpublished state decisions. *Emp'rs Ins. Wausau v.*
   *Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003)

four weeks were not automatically awarded at the beginning of each year. Thus, at best, Defendants mistakenly (but reasonably) believed that Plaintiff was entitled only to 6.64 days of vacation that she had accrued in 2017—which Fallon paid—because any vacation accrued in 2016 could not be carried over under Fallon's vacation policy. As Plaintiff conceded, even she did not know how much vacation pay she was due.

### F.  **Buchner cannot be liable for Plaintiff's gender discrimination or retaliation claim as a matter of law.**

Plaintiff's claims for discrimination and retaliation are brought under FEHA. The California Supreme Court has unequivocally held that only employers—not individuals—can be liable for non-harassment FEHA claims. *See Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158 (2008). Accordingly, Buchner is entitled to summary judgment on both claims for this reason alone.

### G. **Defendants are entitled to summary judgment on Plaintiff's claims for unpaid wages and corresponding penalties for failure to pay wages.**

Plaintiff's remaining claims are for Fallon's alleged failure to pay her all wages allegedly due upon her termination under Labor Code § 201 and penalties under Labor Code § 203 for failing to do so. Specifically, Plaintiff claims that she was entitled to a bonus and four weeks of vacation pay.

Fallon's vacation policy provided that employees accrued paid vacation days throughout the year. In Plaintiff's case, she could accrue up to four weeks (20 days) of vacation pay. At the time of her layoff in April 2017, Plaintiff had accrued 6.64 days of paid vacation. After she disputed that amount, and after she acknowledge that she had used four days of paid vacation in 2016, Fallon voluntarily paid her for ten additional days of vacation (approximately $13,250), for a total of 16 days of paid vacation (*i.e.*, 20 total days less the four days she used). Fallon cannot be liable for not paying Plaintiff wages to which she was not entitled. Similarly, Plaintiff's bonus was not guaranteed, as explained above.

---

It follows that Fallon cannot be liable for waiting time penalties under Labor Code § 203 because Fallon paid Plaintiff everything she was due. Even if Fallon had failed to pay Plaintiff any wages she was due, it was an inadvertent oversight; Fallon did not *willfully* fail to pay Plaintiff's wages, as § 203 requires, particularly given that even Plaintiff did not know how much she was due. *See Ghory v. Al-Lahham*, 209 Cal. App. 3d 1487, 1492 ("As used in section 203, 'willful' means that the employer intentionally failed or refused to perform an act which was required to be done."). After Plaintiff addressed her concerns, through counsel, about unpaid vacation pay and waiting time penalties, Fallon voluntarily paid Plaintiff for 10 additional days of vacation pay (approximately $13,250) for a total of 20 days and waiting time penalties for 16 days of alleged non-payment (approximately $15,000). As Plaintiff acknowledged, even she did not know how much vacation pay she was entitled to. MM depo. at 305:19-22. This shows that, if anything, there was a good faith dispute as to the amount of vacation pay to which Plaintiff was entitled. Fallon did not *willfully* refuse to pay Plaintiff's wages to which she was indisputably entitled. Consequently, Fallon is entitled to summary judgment on her claim for waiting time penalties under § 203. *See* Cal. Code Regs., § 13520 ("[A] good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203.").

## V.   **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion for summary judgment in its entirety.

Dated: March 26, 2018                    JACKSON LEWIS P.C.

By:  /s/Elizabeth Murphy
          Elizabeth H. Murphy
          Philip Johnson

          Attorneys for Defendants
          FALLON GROUP, INC. and
          MICHAEL BUCHNER
          4851-3857-7504, v. 1

---

CASE NO.: CV 17-5526-JFW (Ex)        23